HONORABLE RICHARD A. JONES

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

MANUEL G. GARCIA, SHERMAN
MAH, and RICHARD J.
WOLFINGTON,

              Plaintiffs,

     v.

CITY OF EVERETT, a municipal
corporation; DAVID M. FUDGE,
individually and his marital
community; KATHERINE A.
ATWOOD, individually and her
marital community,

              Defendants.

CASE NO. 14-30 RAJ

ORDER

## I. INTRODUCTION

This matter comes before the court on defendants' motion for summary judgment. Dkt. # 26.  Defendants are the City of Everett ("the City"), former Chief of Police Katherine Atwood, ("Chief Atwood"), and Police Captain David Fudge ("Captain Fudge").  Plaintiffs are officers Manuel Garcia ("Garcia"), Richard Wolfington ("Wolfington"), and Sherman Mah ("Mah").  Mr. Garcia, Mr. Wolfington and Mr. Mah all sought promotions within the Everett Police Department.  Mr. Garcia and Mr. Wolfington are sergeants who applied to become lieutenants and Mr. Mah is a patrol

officer who applied to become a sergeant.  They were denied these promotions.  Plaintiffs believe that the City, Chief Atwood and Captain Fudge discriminated against them on the basis of race.

Plaintiffs allege the following claims in their complaint: (1) disparate treatment, hostile work environment, and retaliation under the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("Section 1981"); (2) that the City maintains a policy, procedure, or custom of discriminating against racial minorities with respect to promotions under 42 U.S.C. § 1983 ("Section 1983"); (3) disparate treatment, hostile work environment, and retaliation under the Washington Law Against Discrimination, RCW 49.60 ("WLAD"); and (4) negligent infliction of emotional distress under Washington common law.   (Am. Compl.) Dkt. # 17, pp. 12-17.

Having reviewed the memoranda, declarations, exhibits, and the record herein, the court GRANTS defendants' motion for summary judgment.[1]

## II. BACKGROUND

This matter concerns promotional decisions made by defendant the City of Everett's police department ("the Department").  The facts of each plaintiff's employment are set forth below along with the methodology used by the Department for determining the pool of candidates eligible for promotion.

**A.  Methodology for Determining Pool of Candidates Eligible for Promotion**

The potential promotional candidates for positions within the Department are identified through a civil service testing process.  (Templeman Decl.) Dkt. # 30, ¶ 23. This process varies, but often includes a written test and an "assessment center" exercise. *Id.*, ¶ 24; Everett, Wa., Civ. Serv., § 2.68.050.  Applicants for sergeant and lieutenant

---

[1] Although plaintiffs filed an over-length opposition in violation of the local rules, the court reviewed and considered the entire brief.  Plaintiffs have been ordered to show cause why they should not be sanctioned in a separate order.  Dkt. # 87.

1    positions receive a time-in-service adjustment, which provides extra "points" and boosts

2    the candidacy of long-tenured employees.  Dkt. # 30, ¶ 24.  The applicants with the top

3    scores are then placed on an eligibility list, which is then certified by the City's Civil

4    Service Commission.[2]  Everett, Wa., Civ. Serv., § 2.68.020.  The Chief of Police then

5    appoints "one of the three top ranked applicants" on the eligibility list.  Dkt. # 30, ¶ 26;

6    Everett, Wa., Civ. Serv., § 2.68.030.

7    **B.  Manual Garcia**

8          Mr. Garcia is Hispanic.  (Garcia Decl.) Dkt. # 40, ¶ 2.  The Department hired Mr.

9    Garcia as a police officer in 1988.  (Templeman Decl.) Dkt. # 30, ¶ 3.[3]  In 2004, he was

10   promoted to sergeant.  *Id.*  In December 2010, he interviewed for a lieutenant position

11   along with two Caucasian candidates, Robert Marshall and John DeRousse.  (Atwood

12   Decl.) Dkt. # 28, ¶ 2.  Mr. DeRousse was chosen for the position.  *Id.*  Three months

13   later, when additional positions opened up, Mr. Garcia was promoted to lieutenant.  *Id.*, ¶

14   3.  All newly promoted lieutenants are subject to a 180-day probationary period before

15   their positions become "permanent."  *Id.*, ¶ 4.  During this period, the Department

16   reviews the employee at 30, 90, and 180-days.  *Id.*, ¶¶4-7.  Mr. Garcia's reviews

17   contained both positive and negative feedback.  Dkt # 29, pp. 7-49.  Mr. Garcia

18   consistently performed well in the area of "working relations/customer service," but

19   received low marks in "reports and records" and mixed or "needs improvement" reviews

20   in all other areas.  *Id.*  At his 30-day review, Captain Fudge noted that Mr. Garcia missed

21   deadlines and failed to respond to emails from citizens and supervisors in a timely

22   manner.  Dkt. # 29, pp. 10-11.  After his 90-day review, Human Resources participated in

23   the drafting of a performance development plan for Mr. Garcia.  (Atwood Decl.) Dkt. #

24   _____

25          [2] The eligibility list remains valid for two to three calendar years.  Everett, Wa.,
26   Civ. Serv., § 2.68.040.
            [3] Dan Templeman is the current Chief of Police.  Dkt. # 30, ¶ 2.  During the time
27   period relevant to this matter, Mr. Templeman served as the Deputy Chief of Police.

1   28, ¶ 5.  During this period, Deputy Chief of Police Dan Templeman, and Captain Fudge
2   met with Mr. Garcia on a weekly basis.  (Fudge Decl.) Dkt. # 29, ¶ 13; (Templeman
3   Decl.) Dkt. # 30, ¶ 10.  After the 180-day review, Captain Fudge noted that Mr. Garcia
4   had shown improvement in some areas, but that he "continued to overlook critical issues,
5   did not follow written or verbal instruction and guidance, and composed documents that
6   were not clearly worded and contained errors in basic grammar."  Dkt. # 29, p. 34.  At the
7   conclusion of the probationary period, Captain Fudge felt that Mr. Garcia's performance
8   had been inadequate.  He advised Chief Atwood that, in his opinion, Mr. Garcia had
9   failed probation.  (Fudge Decl.) Dkt. # 29, ¶ 14.  Chief Atwood, in consultation with
10  Deputy Chief Templeman and the City's Human Resources Department, then made the
11  decision to demote Mr. Garcia.  *Id.*; (Atwood Decl.) Dkt. # 28, ¶¶ 6, 7; (Templeman
12  Decl.) Dkt. # 30, ¶ 11.

13          Today, Mr. Garcia remains a sergeant with the Everett Police Department and has
14  not re-applied for a lieutenant position.  (Templeman Decl.) Dkt. # 30, ¶ 12.

15  **C. Sherman Mah**

16          Mr. Mah is Chinese-American.  (Opp.) Dkt. # 39, p. 4.  The Department hired Mr.
17  Mah in 1995 as a patrol officer.  (Templeman Decl.) Dkt. # 30, ¶ 13.  In 2010, Mr. Mah
18  took the civil service exam to become a sergeant.  (Mah Decl.) Dkt. # 41, ¶ 3.  The Civil
19  Service Commission certified a list of six eligible candidates for vacant sergeant
20  positions:  (1) James Collier, (2) Sherman Mah, (3) Karen White, (4) William Lange, (5)
21  Peter Noetzel, and (6) Trevor Townsend.  (Eligible Register) Dkt. # 58, p. 14.  Mr. Mah
22  interviewed for the position, but the Department ultimately chose Karen White.
23  (Personnel Order) Dkt. # 59, p. 53.  Ms. White is a Caucasian woman.

24          Under the Civil Service Rules, the list remains valid for at least two years.
25  Everett, Wa., Civ. Serv., § 2.68.040(C).  In 2011, three additional sergeant positions
26  became available.  James Collier was promoted into the first open position and William
27  Lange and Peter Noetzel were promoted into the second and third open positions.

1   (Personnel Order) Dkt. # 59, pp. 55-56.  Mr. Mah was not chosen for one of the three

2   open positions.

3        In 2012, a new eligibility list was certified.  (Eligible Register) Dkt. # 26.  Because

4   Mr. Mah remained on the previous list, his name was transferred to the top position on

5   the new list.  Everett, Wa., Civ. Serv., § 2.68.040.  He was again interviewed for a

6   sergeant vacancy, but was not chosen.  Instead the Department chose Kelly Carmen, a

7   Caucasian woman.  (Atwood Decl.) Dkt. # 28, ¶ 16.

8   **D. Richard Wolfington**

9        Mr. Wolfington identifies himself as Native American.  (Wolfington Decl.)  Dkt. #

10  42, ¶ 3.  The Department hired Mr. Wolfington as a police officer in 1993.  (Templeman

11  Decl.) Dkt. #30, ¶ 21.  In 2006, he was promoted to sergeant.

12       In 2010 (the same year as Mr. Garcia), he applied for a lieutenant position.

13  (Atwood Decl.), Dkt. # 28 ¶ 19.  He was not selected for that position.  *Id.*

14  In 2011, when additional lieutenant vacancies opened up, Mr. Garcia was chosen along

15  with two other candidates.  Mr. Wolfington was never promoted to Lieutenant.  *Id.*, ¶ 20.

16  In November 2012, Mr. Wolfington took a medical leave of absence.  (Wolfington Dep.)

17  Dkt. # 27, p. 54.  In 2013, he resigned.  (Wolfington Resignation Letter) Dkt. # 67, p. 53.

18                    **III. LEGAL STANDARD**

19       Summary judgment is appropriate if there is no genuine dispute as to any material

20  fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P.

21  56(a).  The moving party bears the initial burden of demonstrating the absence of a

22  genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

23  Where the moving party will have the burden of proof at trial, it must affirmatively

24  demonstrate that no reasonable trier of fact could find other than for the moving party.

25  *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986).  On an issue where the

26  nonmoving party will bear the burden of proof at trial, the moving party can prevail

27  merely by pointing out to the district court that there is an absence of evidence to support

1   the non-moving party's case. *Celotex Corp.*, 477 U.S. at 325. If the moving party meets

2   the initial burden, the opposing party must set forth specific facts showing that there is a

3   genuine issue of fact for trial in order to defeat the motion. *Anderson v. Liberty Lobby,*

4   *Inc.*, 477 U.S. 242, 250 (1986). The court must view the evidence in the light most

5   favorable to the nonmoving party and draw all reasonable inferences in that party's favor.

6   *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150-51 (2000).

7           However, the court need not, and will not, "scour the record in search of a genuine

8   issue of triable fact." *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996); *see also,*

9   *White v. McDonnel-Douglas Corp.*, 904 F.2d 456, 458 (8th Cir. 1990) (the court need not

10  "speculate on which portion of the record the nonmoving party relies, nor is it obliged to

11  wade through and search the entire record for some specific facts that might support the

12  nonmoving party's claim"). The opposing party must present significant and probative

13  evidence to support its claim or defense. *Intel Corp. v. Hartford Accident & Indem. Co.*,

14  952 F.2d 1551, 1558 (9th Cir. 1991). Uncorroborated allegations and "self-serving

15  testimony" will not create a genuine issue of material fact. *Villiarimo v. Aloha Island*

16  *Air, Inc.*, 281 F.3d 1054, 1061, (9th Cir. 2002); *T.W. Elec. Serv. V. Pac Elec. Contractors*

17  *Ass'n*, 809 F. 2d 626, 630 (9th Cir. 1987).

18                                  **IV. ANALYSIS**

19  **A. Expert Opinion of Michael Letter**

20          As a preliminary matter, the court strikes the improper "expert" opinion testimony

21  of Michael Letter. The court may consider expert opinion if the proposed expert's

22  "specialized knowledge will assist the trier of fact to understand the evidence or to

23  determine a fact in issue." Fed. R. Evid. 702. Such a witness must be "qualified as an

24  expert by knowledge, skill, experience, training, or education" and may testify "if (1) the

25  testimony is based upon sufficient facts or data, (2) the testimony is the product of

26  reliable principles and methods, and (3) the witness has applied the principles and

27  methods reliably to the facts of the case." *Id.* "The trial judge in all cases of proffered

1  expert testimony must find that it is properly grounded, well-reasoned, and not

2  speculative before it can be admitted.  The expert's testimony must be grounded in an

3  accepted body of learning or experience in the expert's field, and the expert must explain

4  how the conclusion is so grounded."  Fed. R. Evid. 702 (advisory committee note).

5      Plaintiffs have not met their burden of establishing that this is proper expert

6  testimony.  Mr. Letter is a former Department inspector who retired in 2004.  (Letter

7  Dep.) Dkt. # 70, p. 40.  No court has ever qualified Mr. Letter as an expert.  *Id.*, p. 38.

8  Mr. Letter has failed to identify a single method or principle he has applied to the facts of

9  this case.  Additionally, the court notes that Mr. Letter did not speak with Captain Fudge

10  or Deputy Chief Templeman and his testimony is not based upon sufficient facts or data.

11  Mr. Letter simply reviewed the same employee evaluations that have been provided to

12  the court.  *Id.*, p. 46.  Because the court is capable of reviewing and analyzing these

13  evaluations on its own, the court finds that Mr. Letter's opinion is not based on any

14  "specialized knowledge" and is not helpful.  Mr. Letter's expert reports are, therefore,

15  stricken.

16  **B. Hostile Work Environment Claims**

17      To establish a prima facie hostile work environment claim, an employee must

18  raise a triable issue of fact as to whether (1) he was subjected to verbal or physical

19  conduct because of his national origin, (2) the conduct was unwelcome, and (3) the

20  conduct was sufficiently severe or pervasive to alter conditions of his employment and

21  create an abusive work environment.  *Manatt v. Bank of Am., NA*, 339 F.3d 792, 798 (9th

22  Cir. 2003).  A hostile work environment exists when the workplace is permeated with

23  discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive as

24  to alter the condition of the victim's employment and create an abusive working

25  environment.  *Faragher v. Boca Raton*, 524 U.S. 775, 786 (1998).

26      Although plaintiffs generally allege a hostile work environment claim in their

27  Amended Complaint, they failed to plead facts that would support such a claim.

1   Plaintiffs also fail to offer any argument related to this claim in their opposition.

2   Accordingly, defendants are entitled to summary judgment on this claim.

3   **C. Discrimination Claims**

4       The elements necessary to establish a prima facie case of discrimination are the

5   same under federal and state law.  *Manatt v. Bank of Am., NA*, 339 F.3d 792, 797 (9th

6   Cir. 2003) (plaintiff must meet the same standards in proving a § 1981 claim that he must

7   meet in establishing a claim under Title VII); *Sischo-Nownejad v. Merced Cmty. Coll.*

8   *Dist.*, 934 F.2d 1104, 1112 (9th Cir.1991) (elements of cause of action under § 1983 are

9   the same as those under Title VII); *Hernandez v. Spacelabs Med. Inc* ., 343 F.3d 1107,

10   1112 (9th Cir. 2003); *Hill v. BCTI Income Fund-I*, 144 Wash. 2d 172, 23 P.3d 440, 446

11   (2001) (Washington has adopted the federal protocol in discrimination cases brought

12   under state and common law). [4]

13       Motions for summary judgment in cases alleging disparate treatment

14   discrimination are analyzed under the burden-shifting framework established in

15   *McDonnell Douglas Corp. v. Green*, 411 U .S. 792 (1973).  Under that framework, a

16   plaintiff must first establish a prima facie case of discrimination.  The burden of

17   production then shifts to the defendant to show legitimate, non-discriminatory reasons for

18   the defendant's action.  The burden then shifts back to the plaintiff to show that the

19   defendant's reasons were pre-textual.  Despite this burden shifting, the ultimate burden of

20   persuading the trier of fact that the employer intentionally discriminated remains at all

21   times with the plaintiff.  *Ray v. Henderson*, 217 F.3d 1234, 1240 (9th Cir. 2000); *Norris*

22   *v. City of San Francisco*, 900 F.2d 1326, 1329 (9th Cir. 1990).

23   

24   

25       [4] Because Title VII of the Civil Rights Act of 1964 was the model for RCW 49.60, courts turn to decisions interpreting the federal provision when analyzing a claim under

26   the WLAD as persuasive authority.  *Xieng v. Peoples Nat. Bank of Washington*, 120 Wash. 2d 512, 518 (1993) (citing *Oliver v. Pacific Northwest Bell Tel. Co.*, 106 Wash. 2d

27   675, 678 (1986)).

1     To make out a prima facie case of disparate treatment, Plaintiff must show that:

2  (1) he belonged to a protected class; (2) he was performing his job in a satisfactory

3  manner; (3) he was subjected to an adverse employment action; and (4) similarly situated

4  employees not in his protected class received more favorable treatment. *Kang v. U. Lim*

5  *Am., Inc.*, 296 F.3d 810, 818 (9th Cir. 2002); *Chuang v. Univ. of Cal. Davis*, 225 F.3d

6  1115, 1123 (9th Cir. 2000). "The requisite degree of proof necessary to establish a prima

7  facie case for Title VII ... on summary judgment is *minimal* and does not even need to

8  rise to the level of a preponderance of the evidence." *Aragon v. Republic Silver State*

9  *Disposal Inc.*, 292 F.3d 654, 659 (9th Cir. 2002) (quoting *Wallis v. J.R. Simplot Co.*, 26

10  F.3d 885, 889 (9th Cir. 1994)).

11     To avoid summary judgment, however, plaintiffs "must do more than establish a

12  prima facie case and deny the credibility of the [defendant's] witnesses." *Bradley v.*

13  *Harcourt, Brace & Co.*, 104 F.3d 267, 270 (9th Cir. 1996) (quoting *Wallis v. J.R. Simplot*

14  *Co.*, 26 F.3d 885, 890 (9th Cir. 1994). Plaintiffs must produce "specific, substantial

15  evidence of pretext." *Id.* An employee's subjective personal judgments of his

16  competence alone do not raise a genuine issue of material fact. *Bradley*, 104 F.3d at 270

17  (citing *Schuler v. Chronicle Broadcasting Co., Inc.*, 793 F.2d 1010, 1011 (9th Cir.1986)).

18    **1.  Manuel Garcia**

19     The parties do not dispute that Mr. Garcia is a member of a protected class

20  (Hispanic) and that he was subject to an adverse employment action -- demotion from

21  lieutenant back to sergeant. To make out a prima facie case of disparate treatment,

22  however, Mr. Garcia must also show that he was performing the job of lieutenant in a

23  satisfactory manner and that similarly situated employees not in his protected class

24  received more favorable treatment. *Kang*, 296 F.3d at 818. Although defendants contend

25  that Mr. Garcia's performance as a lieutenant was inadequate, he has presented sufficient

26  evidence to meet the "minimal" burden required to make out a prima facie case and to

27  survive the first stage of the *McDonnell Douglas* framework.

1    Mr. Garcia believes that he "was performing his job satisfactorily," and to an

2    extent, his written evaluations confirm this belief.  Captain Fudge remarked that Mr.

3    Garcia "excels" in the area of Working Relations/Customer Service and "takes the

4    responsibility of developing all community relationships very serious [*sic*]."  (Garcia

5    evals.) Dkt. # 29, p. 12.  Captain Fudge also stated that Mr. Garcia had been interviewed

6    by media outlets and "his representation of the Police Department was exemplary" and

7    that Mr. Garcia "is a team player."  (Garcia Evals.) Dkt. #29, pp. 24, 37.

8    Mr. Garcia also believes that Captain Fudge treated similarly situated Caucasian

9    employees more favorably than Garcia.  (Garcia Decl.) Dkt # 40, ¶ 4.  He states that

10   Captain Fudge was friendly with newly-appointed Lieutenant DeRousse, but aggressive

11   and antagonistic with him.  He also felt that Captain Fudge was "dismissive,

12   condescending and belittling" toward him, but not toward others.  *Id.*  Mr. Garcia was

13   also the only lieutenant demoted back to sergeant in the Department.  (Fudge Dep.) Dkt.

14   # 60, pp. 50-51.

15   Mr. Garcia's personal observations coupled with the statements in his performance

16   evaluations are sufficient to meet the minimal showing required to make out a prima facie

17   case of disparate treatment.  *See Aragon*, 292 F.3d at 660 (finding employee's self-

18   assessment coupled with minimal additional evidence sufficient to meet prima facie

19   burden).  This showing shifts the burden to the City to proffer a legitimate,

20   nondiscriminatory reason for demoting Mr. Garcia back to his position as a sergeant.

21   The City's stated reason for demoting Mr. Garcia was poor performance as a

22   lieutenant.  Mr. Garcia's evaluations detail a number of instances in which he failed to

23   meet the Department's expectations.  For example, Mr. Garcia stopped to get a haircut in

24   the middle of his shift, while he was wearing his uniform and then lied about doing so.

25   (Garcia Dep.) Dkt. # 27, pp. 9-10.  At the 30-day review, Captain fudge noted that Mr.

26   Garcia failed to meet deadlines (*e.g.*, addressing a citizen complaint "fact finding" four

27   days after it was due ((Garcia Evals.) Dkt. # 29, p. 10) and failing to respond to Deputy

1    Chief Templeman's emails in a timely manner (*Id.*, p. 11)).  Most significantly, he

2    struggled with completing records and reports.  He demonstrated "a significant amount of

3    errors in all facets of the paperwork and process" (*Id.*, p. 20) and much of it was

4    inaccurate and incomplete (*Id.*, pp. 21-22).  The evaluations acknowledge that Mr. Garcia

5    took responsibility and worked hard to correct errors.  *Id.*, p. 30.  Captain Fudge stated

6    that he has "seen a visible change in Lt. Garcia's engaged demeanor and efforts to remain

7    ahead of his paperwork due dates" and that he has "seen Lt. Garcia work extra hours to

8    work on his administrative duties."  *Id.*  Captain Fudge further stated that "[t]he work Lt.

9    Garcia has done creating and maintaining the Casino Road Futbol Camp is something not

10   only he should be proud of, but our entire Department should be proud of…."

11   Ultimately, however, at the 90-day review, Captain Fudge concluded that Mr. Garcia was

12   not meeting many of the necessary expectations of the position "such as strong

13   organizational skills, high quality control efforts, the ability to prioritize workload,

14   require little to no supervision, and be a resource for subordinates and peers to approach

15   for guidance."  *Id.*, p. 30.  This prompted Captain Fudge to involve the Human Resources

16   Department and to implement a performance development plan for Mr. Garcia.  The plan

17   called for weekly meetings among Mr. Garcia, Captain Fudge and Deputy Chief

18   Templeman.  (Fudge Decl.) Dkt. # 29, ¶ 13; (Templeman Decl.) Dkt. # 30, ¶ 10.  After

19   the 180-day review, Captain Fudge noted that Mr. Garcia had shown improvement in

20   some areas, but that he "continued to overlook critical issues, did not follow written or

21   verbal instruction and guidance, and composed documents that were not clearly worded

22   and contained errors in basic grammar."  Dkt. # 29, p. 34.  At the conclusion of the

23   probationary period, Captain Fudge felt that Mr. Garcia's performance had been

24   inadequate.  He advised Chief Atwood that, in his opinion, Mr. Garcia had failed

25   probation.  (Fudge Decl.) Dkt. # 29, ¶ 14.  Chief Atwood, in consultation with Deputy

26   Chief Templeman and the City's Human Resources Department, then made the decision

27

1   to demote Mr. Garcia.  *Id.*; (Atwood Decl.) Dkt. # 28, ¶¶ 6, 7; (Templeman Decl.) Dkt. #

2   30, ¶ 11.

3           Because defendants have stated a legitimate nondiscriminatory reason for the

4   demotion, the burden now shifts back to Mr. Garcia to show that reason was merely

5   pretext for race discrimination.  Mr. Garcia claims that Captain Fudge "lied" numerous

6   times in his evaluations.  (Garcia Decl.) Dkt. # 40, ¶ 9.  However, to avoid summary

7   judgment, Mr. Garcia "must do more than establish a prima facie case and deny the

8   credibility of the [defendant's] witnesses."  *Bradley v. Harcourt, Brace & Co.*, 104 F.3d

9   267, 270 (9th Cir. 1996) (quoting *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 890 (9th Cir.

10  1994); *see also Stones v. Los Angeles*, 796 F.2d 270, 274 (9th Cir. 1986) (finding

11  defendant's reliance on evaluations was a legitimate nondiscriminatory reason for the

12  failure to promote and the subjective nature of the evaluations did not invalidate their

13  usefulness).  Mr. Garcia must produce "specific, substantial evidence of pretext."  *Id.*  He

14  has failed to do so.  Mr. Garcia claims that Captain Fudge held him to performance

15  standards that "were often petty, unreasonable, unfairly applied and different than the

16  normal standards applied to other probationary lieutenants," but he fails to identify any

17  specific examples of such different treatment.  *Id.*, ¶ 12.  The absence of this type of

18  specific evidence is fatal to his claim.

19          Mr. Garcia also states that other officers noticed "a remarkable difference" in the

20  way Captain Fudge treated him and that those officers told him so. [5]  *Id.*, ¶ 5.  Yet, Mr.

21  Garcia fails to produce any declarations from those officers attesting to this difference in

22  treatment.  He also states that Captain Fudge unfairly scrutinized his work and sought out

23  any reason to cause his demotion.  *Id.*, ¶ 9.  But this general allegation does not meet the

24  ───────────────

25          [5] Although Captain Fudge may have declined Mr. Garcia's lunch invitations,

26  while agreeing to go to lunch with newly-promoted Lieutenant DeRousse, this type of

    differential treatment, alone, does not amount to "substantial evidence of pretext."

27  *Bradley*, 104 F.3d at 270.

1  "specific evidence of pretext" standard.  Rather than rebut Captain Fudge's negative

2  evaluations with specific examples of positive performance, Mr. Garcia simply states that

3  he believes he was performing "satisfactorily."  Mr. Garcia's personal opinion of his

4  performance, however, is simply insufficient at this stage of the *McDonnell Douglas*

5  analysis.  As the Ninth Circuit has repeatedly stated, an employee's subjective personal

6  judgments of his competence do not raise a genuine issue of material fact.  *Bradley*, 104

7  F.3d at 270 (citing *Schuler v. Chronicle Broadcasting Co., Inc.*, 793 F.2d 1010, 1011 (9th

8  Cir.1986)); *see also Aragon*, 292 F.3d at 660 (finding that employee's self-assessment

9  may be sufficient at the initial prima facie stage, but would be insufficient at the final

10  stage of the *McDonnell Douglas* analysis).

11        The court declines to infer pretext from these facts.  That said, the court's review

12  of Mr. Garcia's evaluations reveal that he was a strong candidate for promotion and well

13  liked both within the Department and in the community.  Based on the record before this

14  court, there is no question that Mr. Garcia was and continues to be a valuable public

15  servant.  The court believes that Captain Fudge could have done more to mentor Mr.

16  Garcia or perhaps the Department could have employed better methods to assist Mr.

17  Garcia through his probationary period, including perhaps, offering him a second

18  probationary period.  As defendants admit, Mr. Garcia has strong community relations

19  skills and his outreach to the community "leads not only to a better police department, but

20  a better City."  Dkt. # 29, p. 10.  The court wholeheartedly agrees.  Unfortunately, the

21  court does not sit as a super personnel department and cannot dictate the Department's

22  personnel decisions.  *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1063 (9th Cir.

23  2002) ("[C]ourts only require that an employer honestly believed its reason for its

24  actions, even if its reason is foolish or trivial or even baseless.") (internal quotations and

25  citations omitted); *Stewart v. Henderson*, 207 F.3d 374, 378 (7th Cir. 2000) ("The focus

26  of a pretext inquiry is whether the employer's stated reason was honest, not whether it

27  was accurate, wise, or well considered."); *Simms v. Oklahoma*, 165 F.3d 1321, 1330

1   (10th Cir. 1999) ("Our role is to prevent unlawful hiring practices, not to act as a super

2   personnel department that second guesses employers' business judgments.") (citations

3   and quotations omitted).

4          Accordingly, the court finds that Mr. Garcia failed to carry his burden at the third

5   stage of the *McDonnell Douglas* framework and that defendants are entitled to summary

6   judgment on his discrimination claims.

7          **2. <u>Sherman Mah</u>**

8          The parties do not dispute that Mr. Mah is a member of a protected class and that

9   he was subject to an adverse employment action -- the Department's failure to promote

10  him from parole officer to sergeant.  Additionally, documents in the record, including Mr.

11  Mah's performance evaluations, show that he was performing his job in a satisfactory

12  manner, yet the Department chose other Caucasian employees over him for the position

13  of sergeant.  (Mah Evals.)  Dkt. # 57, pp. 10-61; (Atwood Decl.) Dkt. #28, ¶¶ 9, 16.  This

14  evidence establishes a prima facie case and is sufficient to survive the first stage of the

15  *McDonnell Douglas* framework.

16         Accordingly, the burden shifts to defendants to articulate a legitimate,

17  nondiscriminatory reason for failing to promote Mr. Mah.  According to defendants, Mr.

18  Mah was not promoted because he performed poorly during his interviews and lacked

19  necessary leadership skills.  During the 2010 interview, the panel that interviewed Mr.

20  Mah found that his answers were rambling and off subject.  (Templeman Decl.) Dkt. #

21  30, ¶ 14; (Atwood Decl.) Dkt. # 28, ¶ 10; (Scharf Dep.) Dkt. # 27, pp. 45-46.  They also

22  found that he showed a lack of supervisory skills and basic judgment.  (Atwood Decl.)

23  Dkt. # 28, ¶¶ 10, 11; (Templeman Decl.) Dkt. # 30, ¶¶ 14, 15.  For instance, in response

24  to a question asking Mr. Mah to identify a concrete example of leadership, he admits that

25  he offered another officer "advice and counseling on how to perform his job so that he

26  wouldn't be focused on by administration and avoid legal questions about his conduct."

27  (Mah Dep.) Dkt. # 27, p. 27.

1       Following his first interview, Mr. Mah approached Deputy Chief Atwood and

2  acknowledged that he did not interview well.   (Atwood Decl.) Dkt. # 28, ¶ 12 & Ex. A

3  (email from Mr. Mah stating: "Hi Kathy, during the chief's interview, I did not interview

4  well.").  At the end of the interview, at least one panel member suggested that Mr. Mah

5  apply for a master police officer ("MPO") position to help him obtain supervisory

6  experience.  (Mah Dep.) Dkt. # 27, p. 30.  Mr. Mah did not do so because he did not want

7  to work night shifts. *Id.*, pp. 30-31.

8       At his second interview, in 2012, the panel again felt that Mr. Mah interviewed

9  poorly.  They felt that he was unprepared for the interview and failed to demonstrate the

10  leadership qualities necessary to serve as a sergeant.  (Atwood Decl.) Dkt. # 28, ¶¶ 17,

11  18; (Templeman Decl.) Dkt. # 30, ¶ 19.  Additionally, the panel noted that he had not

12  applied for a MPO position.  (Mah Dep.) Dkt. # 27, p. 33.  These are legitimate reasons

13  for declining to promote Mr. Mah to the position of sergeant. *Roberson v. Pac. Lutheran*

14  *Univ.*, 2013 WL 5966133, at *3-4 (W.D. Wash. Nov. 8, 2013) (finding that employer

15  articulated legitimate nondiscriminatory reason for refusing to hire applicant who lacked

16  adequate communication skills and provided answers that were "lengthy, unfocused and

17  did not respond to the specific questions asked.").

18       Thus, to avoid summary judgment, Mr. Mah must produce "specific, substantial

19  evidence of pretext." *Id.*  He fails to meet this burden.  First, Mr. Mah claims that his

20  recollection of the interviews is directly at odds with the reports of the panel members.

21  (Opp.) Dkt. # 49, p. 26.  Not true.  Mr. Mah does not deny many of the responses recalled

22  by the panel members, any one of which would have been a legitimate reason to deny

23  him a promotion.  (Opp.) Dkt. # 49, pp. 4-5; (Mah Dep.) Dkt. # 27, p. 27; (Atwood Decl.)

24  Dkt. # 28, Ex. A.  To the extent Mr. Mah now recalls certain events differently, his

25  recollection conflicts with his deposition testimony and cannot be used to defeat

26

27

summary judgment.[6]  *See Yeager v. Bowlin*, 693 F.3d 1076, 1080 (9th Cir. 2012)
(striking declaration where "the deponent remember[ed] almost nothing about the events
central to the case during his deposition, but suddenly recalled those same events with
perfect clarity in his declaration in opposition to summary judgment.").

Next, Mr. Mah argues that the panel misconstrued his responses.  (Opp.) Dkt. #
49, p. 26.  Although this is entirely possible, it is immaterial.  The court's inquiry focuses
on whether the City's explanation for why it determined Mr. Mah was not the best
candidate was an honest one, not whether it was accurate.  *Villiarimo*, 281 F.3d at 1063
("[C]ourts only require that an employer honestly believed its reason for its actions, even
if its reason is foolish or trivial or even baseless.") (internal quotations and citations
omitted).

Finally, Mr. Mah claims that in 2010 and 2011, he was "skipped over" for
promotion in violation of the City's civil service "Rule of 3."  When the eligibility list
was certified, six names appeared in the following order: (1) James Collier, (2) Sherman
Mah, (3) Karen White, (4) William Lange, (5) Peter Noetzel, and (6) Trevor Townsend.
(Eligible Register) Dkt. # 58, p. 14.  In 2010, only one position for sergeant was open.
Based upon the "rule of three," the Chief of Police was permitted to appoint any "one of
the three top ranked applicants" on the eligibility list.  Everett, Wa., Civ. Serv., §
2.68.030.  Although Karen White was ranked third on the list, she was promoted to the
position.  (Personnel Order) Dkt. # 59, p. 53.  Three additional positions opened up in
2011.  Based upon that same list, the Chief promoted James Collier, William Lange, and

---

[6] For example, Mr. Mah now claims that he did not portray himself as a loner in
his interview, but rather conveyed that he was his crew's "play-maker" and "organizer."
Mr. Mah, however, never mentioned these statements in his deposition.  (Mah Dep.) Dkt.
# 70, p. 55.  Additionally, Mr. Mah now claims that he was never given an acting
sergeant assignment.  (Opp.) Dkt. # 49, pp. 8-9.  Yet, in his deposition, he indicates that
he was given such an assignment.  (Mah Dep.) Dkt. # 70, p. 152 ("Q. You did.  You were
allowed to be an acting sergeant in 2011, 2012, correct?; A. Correct.").

Peter Noetzel – the candidates who appeared first, fourth and fifth on the original list. (Personnel Order) Dkt. # 59, pp. 55-56.  Mr. Mah appears to argue that the "rule of 3" required that he be promoted.  Not so.  A plain reading of the civil service statute allows the Chief of Police discretion to choose "one of the three top ranked candidates." Everett, Wa., Civ. Serv., § 2.68.030.  Thus, in this instance, as each promotion occurred, each candidate moved up into one of the top three spots.  It is Mr. Mah's burden to show that the civil service rules compelled his promotion, yet he has failed to offer any admissible evidence in support of this interpretation.  Indeed, the Washington Supreme Court interpreted a prior version of the Everett civil service rules as allowing the practice that occurred here.  *See generally Hellum v. Johnson*, 51 Wash. 2d 326, 329 (1957) (finding that after two vacancies were filled from eligibility list, police department was not restricted to first candidate on the list, but could choose from remaining top three candidates at time of appointment).

Accordingly, the court finds that Mr. Mah has failed to carry his burden at the third stage of the *McDonnell Douglas* framework and that defendants are entitled to summary judgment on his discrimination claims.

### 3.  Richard Wolfington

The parties dispute whether Mr. Wolfington is a member of a protected class.  Mr. Wolfington identifies himself as Native-American, but defendants argue that he is not an official member of any tribe and has never taken a DNA test to confirm his ancestral background.  (Mot.) Dkt. # 26, p. 22.  Mr. Wolfington claims that he identified himself as Indian or Native-American on his application for employment, that he had Native-American tattoos, often spoke openly about his involvement with the Tulalip Tribe, that his kids went to school on the Tulalip Indian Reservation and that he coached wrestling there.  (Wolfington Decl.)  Dkt. # 42, ¶ 3.  The court finds these facts sufficient to meet Mr. Wolfington's minimal burden at the prima facie stage.  Additionally, the court has reviewed Mr. Wolfington's evaluations, the majority of which indicate that he met or

1    exceeded standards.  (Wolfington Evals.) Dkt. # 38, pp. 71-82.  This evidence is

2    sufficient to meet the minimal burden required to show that he was performing his job in

3    a satisfactory manner.  Finally, Mr. Wolfington alleges that he suffered two adverse

4    employment actions (1) the Department's failure to promote him from sergeant to

5    lieutenant (while promoting people outside his protected class) and (2) constructive

6    discharge.  Although he alleges sufficient facts to support his failure to promote claim,

7    his constructive discharge claim fails at the prima facie stage.  To state a claim for

8    constructive discharge, the employee must establish that his working conditions were

9    *intolerable* at the time of the employee's resignation.  *Wallace v. City of San Diego*, 479

10   F.3d 616, 632-33 (9th Cir. 2006).  This standard is objective; the employee's mere

11   subjective dissatisfaction with the employer's actions is insufficient.  *Townsend v. Walla*

12   *Walla School Dist.*, 147 Wash. App. 620, 627-28 (2008).  The fact that Mr. Wolfington

13   feels Captain Fudge excessively scrutinized his work and assessed his performance too

14   harshly does not amount to the kind of egregious misconduct required for a constructive

15   discharge claim.

16          Accordingly, the only adverse action relevant to the *McDonnell Douglas* burden

17   shifting analysis is Mr. Wolfington's failure to promote claim.  According to defendants,

18   Mr. Wolfington, when compared to other candidates, had not consistently demonstrated

19   the ability to perform the administrative and leadership functions of a lieutenant.

20   (Atwood Decl.) Dkt. # 28, ¶ 20.  This is a legitimate non-discriminatory reason for failing

21   to promote him.

22          The burden now shifts back to Mr. Wolfington to demonstrate that this stated

23   reason is merely pretext for race discrimination.  Mr. Wolfington fails to meet this

24   burden.  First, Mr. Wolfington claims that Captain Fudge did not treat him the same way

25   as Caucasian officers.  (Opp.) Dkt. # 49, p. 20 n. 195; (Wolfington Decl.) Dkt. # 42, ¶ 6.

26   He offers no specific examples, however, of this difference in treatment.  Although he

27   generally alleges that Captain Fudge's demeanor and attitude were negative and

1  condescending, he does not identify specific instances in which officers outside of Mr.

2  Wolfington's protected class were treated better by Captain Fudge.

3      Next, Mr. Wolfington claims that he was "skipped over" for promotion in

4  violation of the City's civil service rules.  Yet, he fails to offer any admissible evidence in

5  support of his interpretation of the promotional process.  Just as with Mr. Mah, it is Mr.

6  Wolfington's burden to show that the civil service rules compelled his promotion.  He

7  fails to meet this burden.  *See generally Hellum*, 51 Wash. 2d at 329.

8      Finally, the ultimate decision-maker with respect to Mr. Wolfington's promotion

9  was Chief Atwood, not Captain Fudge.  Although Mr. Wolfington's evidence with

10 respect to whether Captain Fudge knew he was Native-American may be sufficient to

11 survive the first stage of the *McDonnell Douglas* framework, it is tenuous at the third

12 stage.  Mr. Wolfington admits that he could not recall a specific incident in which he told

13 Captain Fudge that he is Native-American.  (Wolfington Dep.) Dkt. # 70, p. 62.  He also

14 cannot recall telling Chief Atwood that he is Native-American, nor does he offer any

15 evidence to rebut Ms. Atwood's statement that she was unaware of his race.  *Id.*;

16 (Atwood Decl.) Dkt. # 28, ¶ 22.

17     Accordingly, the court finds that Mr. Wolfington has failed to carry his burden at

18 the third stage of the *McDonnell Douglas* framework and that defendants are entitled to

19 summary judgment on his discrimination claims.

20 **D. Retaliation Claims**

21     Mr. Wolfington is the only plaintiff claiming retaliation.  (Opp.) Dkt. # 49, pp. 34-

22 35.[7]

23     In 2010, Mr. Wolfington advised his supervisor Lieutenant Frankowiak that

24 Captain Fudge had engaged in an extramarital affair and harassed a female officer.

25 _____

26     [7] Plaintiffs do not oppose summary judgment with respect to Mr. Garcia and Mr.

27 Mah's retaliation claims.  (Opp.) Dkt. # 49, pp. 34-35.

1  (Wolfington Dep.) Dkt. # 27, pp. 62-64.  Mr. Wolfington claims that this report caused

2  Captain Fudge to retaliate against him.  He fails, however, to submit any evidence that

3  Captain Fudge knew of his discussion with Lieutenant Frankowiak.  *Pham v. City of*

4  *Seattle*, 7 F. App'x 575, 576 (9th Cir. 2001) (citing *Miller v. Fairchild Indus., Inc.*, 797

5  F.2d 727, 731-32 (9th Cir. 1986) (plaintiff must show that "(1) the employer knew about

6  the protected activity, and (2) the two events were sufficiently related in time to establish

7  a retaliatory motive.").  To defeat summary judgment, plaintiff must do more than rest on

8  his allegations; he must come forward with specific facts that show a genuine issue for

9  trial.  *Anderson*, 477 U.S. at 250.  He has failed to meet this burden.

10    Accordingly, defendants are entitled to summary judgment with respect to

11  plaintiffs' retaliation claims.

12  **E.  Negligent Infliction of Emotional Distress**

13    To prove a defendant negligently caused the plaintiff emotional distress, the

14  plaintiff must show that: (1) he displays objective symptoms; (2) his reaction was that of

15  a normal person; and (3) he satisfies the four negligence elements of duty, breach

16  causation, and harm.  *Colbert v. Moomba Sports, Inc.*, 132 Wash. App. 916, 925-26

17  (2006).  A claim of negligent infliction of emotional distress requires proof of objective

18  symptoms of emotional distress.  *Hegel v. McMahon*, 136 Wash. 2d 122, 960 P.2d 424,

19  431 (1998) (requiring emotional distress "susceptible to medical diagnosis and provable

20  through medical evidence").

21    Plaintiffs identify no evidence in support of this claim in their opposition.

22  Accordingly, they have failed to set forth specific facts showing that there is a genuine

23  issue for trial and defendants are entitled to summary judgment.

24  **V. CONCLUSION**

25    For all the foregoing reasons, the court GRANTS defendants' motion for summary

26  judgment.  The Clerk is directed to enter judgment in favor of defendants and against

27  plaintiffs.  The Clerk is also directed to terminate all pending motions.

1    Dated this 16th day of April, 2015.

2

3

4

5    The Honorable Richard A. Jones
     United States District Judge
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

ORDER- 21